LOTTINGER, Judge.
This suit is for damages resulting from a vehicular collision on November 25, 1965, on U. S. Highway 90 between Jeanerette and Baldwin, Louisiana. The petitioners are Barbara Bell, wife of and Herbert Bell, who sue individually and for and on behalf of their minor child. The defendants are Donald Ray Sparrow, John Broussard and Southern Farm Bureau Casualty Insurance Company, the driver, owner and liability insurer respectively, of a tractor-trailer cane unit and Minus Falterman, Ibert Funeral Home, and Continental Insurance Company, the driver, owner and liability insurer respectively, of an ambulance in which Mrs. Bell and her husband were riding at the time of the accident.
The suit as against Donald Ray Sparrow was subsequently dismissed because he was a minor and lacked the procedural capacity to be sued. Suit was also dismissed as against Ibert’s Funeral Home because it was never served and is not a legal entity.
After trial, the Lower Court gave judgment in favor of petitioners and against Minus Falterman and Continental Insurance Company, and dismissed the suit as same bears against Sparrow, Broussard and Southern Farm Bureau Casualty Insurance Company. Devolutive appeals were taken by Continental Insurance Company and Minus Falterman as well as by all petitioners.
The record discloses that at the time of the accident, a unit composed of a farm tractor and two 35 to 40 foot empty cane wagons, owned by John Broussard, was being operated in a westerly direction by Broussard’s employee, Donald Sparrow. Neither of the two cane wagons being pulled had any lights whatsoever although the rear wagon did contain a reflector.
Shortly prior to the accident, Mr. Falter-man, an employee of the Ibert Funeral Home in Franklin, had driven a 1962 model Cadillac ambulance to the residence of Mr. and Mrs. Bell in Franklin in order to trans *731 fer Mrs. Bell and her husband to the hospital in Lafayette where Mrs. Bell’s expected baby could be delivered. Just prior to the accident, Falterman had passed some amount of traffic heading east on U. S. 90, and, as the lights of the last car passed him, he saw for the first time the empty rear cane wagon ahead of him which had no lights whatsoever on it. He applied his brakes but could not avoid running into the rear of the cane wagon.
Subsequent to the accident the Bells’ child was delivered but was never conscious and died an hour or so after birth. The Bells sued for their own injuries, medical expenses, as well as the death of the newborn infant.
After trial on the merits the Lower Court dismissed the suit as against Broussard and his insurer, but rendered judgment in favor of Barbara Bell in the sum of $2,750.00, and for Herbert Bell in the amount of $2,267.01, and against Minus Falterman and Continental Insurance Company in solido. Both petitioners, as well as the two defendants cast in judgment by the Lower Court, perfected devolutive appeals.
It is contended by Continental Insurance Company and Falterman that the Trial Court erred in failing to find that the sole and proximate cause of the collision was the negligence of Broussard and Sparrow in failing to properly equip the cane wagon with rear view lights in accordance with law, particularly R.S. 32:301 and 32:304, and in operating such defectively equipped vehicles on the highway in darkness, thus creating an extremely hazardous and dangerous situation and proximately causing the accident. In the alternative, they claim that even if Falterman was negligent in the operation of his ambulance, the negligence of Sparrow and Broussard constituted a joint and concurrent cause of the accident and the defendants are entitled to contribution from them and their insurer for a full one-half of any judgment rendered in favor of the Bells.
The testimony discloses that at the time of the accident the ambulance driven by Falterman was going at a speed of from 40 to 45 miles per hour. It was dark and somewhat foggy at the time. Falterman testified that immediately prior to' his seeing the cane wagon in front of him, he had passed several vehicles proceeding in the opposite direction, the headlights of which affected his vision to some extent. For this reason he was traveling with his lights on dimmers, and, after the last car passed, he noticed the tractor wagon in front of him and immediately applied his brakes and skidded some fifteen feet before impact. He testified that in some spots the fog was thicker than others, but that it was still foggy all the way. Upon being asked the question as to how far was his visibility at the area of the accident, he replied: “That, I wouldn’t remember. I know it was pretty thick there, ’cause if it wouldn’t have been too thick, I imagine my lights would have been shining a little bit further ahead, you understand.”
There were other witnesses who testified as to varying degrees of fogginess at the scene of the accident. These witnesses also testified that at the time of the accident it was still dark.
Under the circumstances we believe that the Lower Court correctly held that Falterman was guilty of negligence in proceeding at an excessive rate of speed under the circumstances, and that his negligence was one of the proximate causes of the accident. This conclusion certainly follows Falterman’s testimony as to the degree of fogginess at the scene of the .accident.
In order to negate any negligence on the part of Broussard and his insurer, they contend (1) That it was not dark at the time of the accident, and (2) That the cane wagons were “well lighted” because there was a white light at the rear of the tractor which was facing to the rear down on the cane wagons, which presumably would warn an overtaking motorist of the presence of the cane wagons.
*732 With regard to the first contention of the said defendants relative to the degree of darkness at the time of the accident, we believe that the evidence conclusively shows that it was dark. As a matter of fact, several of the witnesses who arrived on the scene several minutes after the accident, testified that it was just commencing to be dusk at the time they arrived on the scene.
Furthermore, the testimony shows that the accident occurred at 5:50 A.M., in the morning. Lt. Huey Bourgeois, a State Trooper, testified that the accident was reported to State Police Headquarters at approximately 6:10 A.M. When he arrived at the scene he testified that it was still dark, and there was no question as to that.
In reply to the second contention by the defendants, i. e. that the wagons were “well lighted”, the evidence shows without contradiction that there were no lights whatsoever on the rear cane wagon. The only light from the tractor-wagon combination which was showing to the rear would have been the white light situated on the rear of the tractor facing downward into the cane wagons. Other than this, the only thing which would remotely resemble a light to the rear of the tractor-wagon unit, was the reflector which Mr. Broussard testified was on the rear cane wagon.'
Title 32, Section 301 of the Louisiana Revised Statutes, provides as follows:
“Every vehicle upon a highway within this state at any time between sunset and sunrise and at any other time when, due to insufficient light or unfavorable atmospheric conditions, persons and vehicles on the highway are not clearly discernible at a distance of 500 feet ahead, shall display lighted lamps and illuminating devices as hereinafter respectively required for different classes of vehicles subject to exception with respect to parked vehicles.”
With regard to tail lamps, Sub Section A of Section 304, goes on to say in part that:
“Every motor vehicle, trailer, and semitrailer and any other vehicle which is being drawn at the end of a train of vehicles, shall be equipped with at least one tail lamp mounted on the rear, which, when lighted as hereinbefore required in R.S. 32:301, shall emit a red light plainly visible from a distance of 500 feet to the rear, provided that in the case of a train of vehicles only the tail lamps on the rearmost vehicle need actually be seen from the distance specified.”
Thus we find that Mr. Broussard failed to equip his cane wagons with tail lights in direct violation of Louisiana Law, and then permitted these wagons to be towed on a much traveled main highway when it was yet dark, contrary to the provisions of R.S. 32:301 and 32:304. The question now arises as to whether this violation constituted negligence which was a proximate cause of the accident.
In Attaway v. Schluntz, La.App., 208 So.2d 332, the plaintiff’s son and his passenger sued for injuries sustained when their motorcycle was struck from the rear by defendant’s automobile. The motorcycle was shown to have no tail light at the rear thereof. In denying recovery, we found that petitioners were in violation of R.S. 32:301 and 32:304 and stated:
“It is well settled law that failure to observe a provision of the Highway Regulatory Act constitutes negligence per se. Appellants argue, that even assuming the absence of a taillight, this defect had no causal relationship with the accident or at most was only a remote cause, the alleged negligent operation of the Schluntz vehicle being the proximate cause.
The absence of the taillight in this case was a contributing cause of the accident, in that if the motorcycle had been properly equipped the driver of the Schluntz automobile would have been able to see the motorcycle long before he was confronted with the prospect of imminent collision, notwithstanding the unproven possibility of excessive speed on his part.”
*733 In D & D Planting Company v. Employers Casualty Company, 240 La. 684, 124 So.2d 908, an automobile ran into the rear end of an unlighted trailer which at the time was being pulled by a tractor. The tractor was equipped with a powerful, small floodlight mounted on the back of the driver’s seat, which light was deflected downward so that the outer edge of the beam would hit the ground perhaps 20 feet to the rear of the tractor. The trailer which was being towed by this tractor was unlighted. Although the Court of Appeal held that the driver of the tractor was not negligent in failing to equip this tractor with the required tail lights, the Supreme Court reversed, holding that the owner and driver of the tractor was negligent in failing to maintain proper lights on the trailer, and that there was a causal connection between that negligence and the accident. In so holding, the Supreme Court said:
“It is true that Mr. Neely was traveling at a rapid rate of speed and that it was incumbent upon him to have his car under control at all times, but had the trailer borne lights in conformity with the statutes, supra, it would have appeared within his vision at a distance of 500 feet and he would then have been in a position to avoid the accident. We conclude that plaintiffs were negligent in not having the trailer lighted and that but for this negligence the accident would not have occurred.”
In distinguishing the D & D Planting Company case, the Court, in McDermit v. Northern Insurance Company, La.App., 126 So.2d 726, said:
“In the D & D Planting Company case the Supreme Court apparently disagree with the Second Circuit Court of Appeal as to the facts, the Supreme Court concluding that the forward vehicle was not sufficiently lighted to make it visible to the motorist approaching from the rear within a distance of 500 feet.”
In McDermit, the Court held that the light on the side of the cotton-picking machine was visible for a distance of 500 feet to the rear, and the Court refused to charge plaintiff with negligence constituting a proximate or contributing cause of the accident, merely because of the fact that the cotton-picking machine was being operated on a public highway with a rear light which was white instead of red.
Such is not the case before us. There is no testimony in the record to show that the light on the rear of the tractor in the present case could be seen for a distance of 500 feet to the rear of the last wagon. These cane wagons were each some 40 feet long, and the combination to the rear of the tractor .and the white light was in excess of 80 feet. Thus this light would have had to be visible for a distance of 580 feet in order to comply with the statutes.
The only witness who testified that he had seen the white light and reflector while the tractor-wagon combination was on the highway that morning was Mr. George T. Derise, a fellow board member to defendant Broussard of the St. Mary Coop. He testified that he left the sugar house after 6:00 o’clock A.M. on the morning of the accident at which time it was dawn. He proceeded toward Jeanerette, and passed the Broussard tractor-wagon combination just shortly before the accident. He testified that prior to passing the Brous-sard vehicles, he could clearly see the white light from a distance of which he estimated of about three hundred feet and that when later his headlights struck the reflector on the end of the rear wagon, the reflector “ * * * glowed like it came alive with its own power.” He proceeded to pass the tractor-wagon combination as there was no traffic approaching in the opposite direction.
Mr. Derise was emphatic in his testimony that it was dawn when he left the sugar house some few minutes before the accident, although the other witnesses testified that it was still dark when they arrived at the scene of the accident some ten to fifteen minutes following the accident. Mr. Derise also testified that there was no fog on the *734 morning of the .accident, which is contradictory to the testimony of all the other witnesses who testified as to this fact.
We are not impressed with the testimony of Mr. Derise in view of the contradictory testimony of the other witnesses. The most his testimony would show would be that the white light was visible for a distance of some 300 feet. The law requires that the light be visible for a distance of 500 feet.
We feel that the tractor-wagon combination was not properly lighted in accordance with law and that the ineffective lighting thereof constituted such negligence as to be a proximate cause of the accident.
With regard to quantum, the record discloses that the baby of Mrs. Bell was delivered in the hospital following the accident. The child lived for approximately one hour and died as a result of trauma. In assessing damages to the parents of the child for grief, love, affection and companionship, the Lower Court said:
“It must be considered also that the mother hardly knew that the child had been delivered. She and her husband never saw the child from the time of birth to the time of burial, and there was no time for the development of grief and loss of love, affection and companionship. There was no time for the development of any of the factors set out in LEWIS vs. STATE, [La.App.] 1965, 176 So.2d 718, writ refused [Fountain v. State, Through State Bd. of Institutions, 248 La. 364] 178 So. 655.
The general amount awarded to each parent for the tortious death of a child from 19 mpnths of age upwards runs from $7,500.00 to $12,500.00. In [McConathy] McConothy [v. United Services Auto Ass’n], 188 So.2d 470, La.App.1966, the Court allowed $15,000.00.
But, because, I see no authority to> place a real value in this case, I feel that nominal damages should be allowed in the amount of $750.00 to each parent.”
The factors as set out in Lewis v. State, which was cited by the Lower Court, are as follows:
“The factors to be considered in fixing the amount of .an award in a death action include closeness of the ties between the parties and degree of love and affection * * *; the age of the child and station in life of the parents * * *; probability and degree of future support by the child * ■- * *; and intelligence and other factors relating to the type of future life expectable by the child * * ”
While it is true that the claim for damages for a child which had only lived for an hour would not equal the amount of that for a child which had lived for a much longer period during which the parents came to know .and love the child, we certainly do believe that the loss of the child in the present case and under the present circumstances must have brought a great deal of grief and sorrow to the parents. While the evidence discloses that the Bells never did see their child, and that Mrs. Bell was notified of its death while in the ambulance being transferred from the hospital in Lafayette to New Orleans, we certainly feel that the death of the infant under the circumstances must have been of great shock to the parents. The record discloses that at the time of the accident and the death of the child, the Bells had one child, age 10' years. While they did not know the deceased infant, Mrs. Bell had carried the child for a period of nine months and was on the way to the hospital for the blessed event at the time of the fatal accident. While the loss of the child cannot be valued in money, we feel that th,e loss was a great one.
In view of the above, we believe that the award by the Lower Court to the parents for the loss of their child was inadequate and the award to each parent will be increased to the sum of $2,500.00.
The Lower Court refused to allow any damages for the pain and suffering of *735 the minor child prior to his death because it was shown that the minor child was totally unconscious for the entire one hour period of his life. This refusal on the part of the Lower Court is in line with the jurisprudence of Palmer v. American General Insurance Company, La.App., 126 So.2d 777, and cases cited therein.
Following emergency treatment at the Lafayette Hospital, Mrs. Bell was transported by ambulance to Charity Hospitál in New Orleans, where she was admitted on November 25, 1965. She remained hospitalized at Charity until December, 1965, when she was discharged and sent home for recovery. She attended outpatient clinics at intervals through January 9, 1967. At the time of trial she was complaining of right frontal headaches, for which she was receiving some relief from Darvon. She was instructed to continue Darvon until her return to the hospital for examination in six months.
As a result of the accident, she sustained a fractured skull, facial cuts, bruises, and related symptoms. The Lower Court awarded her $2,000.00 for the pain, suffering, etc. In its reasons for judgment, however, the Lower Court was of the opinion that Mrs. Bell had not received a fractured skull. The testimony of Dr. Fernandez, on the other hand, shows without question that she had a fracture of the skull. Dr. Fernandez, her treating physician, said that he could see it with the naked eye and he put his finger in it. In view of this, we believe that the award by the Lower Court is inadequate and it will be increased to the sum of $3,000.00.
The injuries to Mr. Bell were minor and we feel that the sum of $500.00 for his pain and suffering awarded by the Lower Court is adequate.
For the reasons hereinabove assigned, the judgment of the Lower Court will be amended so that there will be judgment in favor of petitioners and against defendants, John Broussard, Southern Farm Bureau Casualty Insurance Company, Minus Falterman and Continental Insurance Company, in solido, amending the judgment below so as to increase the amount awarded Mr. and Mrs. Bell for the loss of their infant to the sum of $2,500.00 each, .and to increase the amount awarded to Mrs. Bell for pain and suffering to the sum of $3,000.00, thus making the total award in favor of Mrs. Bell in the sum of $5,500.-00, and the total award in favor of Mr. Bell in the sum of $4,017.01, and, as so amended, the judgment of the Lower Court will be affirmed. All costs of this appeal to be paid by defendants.
Judgment amended and affirmed.